Good afternoon, your honors. Mike Schulenburg on behalf of the appellants James and Wendy It concluded with a trial in the summer of 2016 and hence the appeal before the court. What's common to both the defendants and the plaintiffs in this matter is that they share a common father or father-in-law. This dispute revolves around an undivided parcel of land in LaSalle County. The father or father, Martin Butler, was one of seven siblings. Upon the death of his parents, all the seven siblings inherited and one-seventh share of the farm. Martin Butler disclaimed his interest because of a tax liability issue and that property transferred to his children, three children. One of them was a defendant. He didn't disclaim an interest. He passed it along. Well, he filed a disclaimer, Judge. He filed a disclaimer. How many properties does one thing that's not certified appropriate have? There is, there's, the Tillable Acres, Judge, I want to say that the determination of the Tillable Acres by the court was 144 Tillable Acres. I'd have to, I'd have to, I don't remember the exact number. In addition to that, Judge, there's two parcels on the undivided property. There's both a west house and there's an east house. And specifically, one of the issues of contention was the occupancy of the west house. But in the Tillable Acres, what are we talking about? I, I, I want to say, Judge, it's like 200 and, I want to say it's not, it's not a large, a huge farm, Judge, but it's somewhere around 220, right around there. I want to say that's, and I'm sorry, Judge, I forgot that detail. It's the length of the farm or the total amount. At the time of the filing of the lawsuit, Judge, the, my clients, they were sixth, seventh owners of the property. They had purchased that property from the, Martin Butler's siblings. And the plaintiffs in the matter, they were one-seventh owner's interest in the property. There became, at the, at the time between the relevant issues of 1989 and 1993, Martin Butler was residing in the west house. And there was an issue as to whether or not Martin Butler was in fact an agent or acting on behalf of, of the plaintiffs. So there were pleadings and there was deposition answers in the course of this, of the proceedings, one of which was a deposition of Edward Butler. Butler was asked the question, has Martin Butler ever been your agent for yourself? The answer was no, for any purpose, not that I'm aware of, no. There was depositions of Stephen Butler, Lane Butler, Martin, all, both depositions and interrogatory answers. They all had consistent answers that, in fact, that Martin Butler was not their agent. In fact, this issue became relevant in pleadings. There was a pleading filed by, by counsel for the, for the one-seventh owner's interest on January 4th, 1994. A position paper indicated that plaintiffs at no time authorized Martin Butler or anyone else to act on their behalf, act as their agent when dealing with James Gore's matters relating to the farm. And subsequent to that time period, because this case had lasted so long, a number of participants had passed away. One of them was Martin Butler, passed away around 2000. Subsequent to that time period, the six-seventh owners, my clients, came into possession of certain papers of his. And one of those papers that they came into possession of was identified as, there was two identical documents identified as Defendant's Exhibits Number 45 and 46. And the document provides, signed by Edward Butler, I hereby grant to my father, Martin Butler, full authority to act on my behalf regarding any interest in the property derived from the estate of Rufus Butler and Jolene Butler. When, so, and it's clear, at least from an evidentiary standpoint, in regards to the deposition answers, in regards to the pleadings, that those pleadings and the depositions and the interlocutories were not truthful. This became an issue because one of the issues before the trial court was, was rents as between the parties for the years 1989 to 1993, the same time period that Martin Butler was residing in the West House. And one of the, what came out through the trial, and what came out, also by stipulation of the parties actually at trial, was a July 22, 2016 order that stipulated as to the fair market value of the tenable acres, rental value of $120, fair market value rental for the West House of $450 a month, fair market rental value for the East House of $300 a month, $350 a month, was also stipulation to a bathroom that Martin Butler had removed from the property around 1994 that had a value of about $7,000. And so in determining that issue as to rents between the parties, that whether or not they would be liable for their agent residing in the West House, whether or not that would be counted against that, if the purpose is accounting for those time periods. Also the fact that whether or not they would be liable for the bathroom that Martin Butler took from the property. A bathroom incidentally that ended up in the possession of Edward Butler, one of the main plaintiffs in this matter. So it was always our contention, and I think the court also found that this in fact happened, is that from the get-go there was a filing that they fleeted that Martin, that James and Wendy Gore were operating the farm pursuant to an oral agreement. After that filing they denied that there was any agreement between James and Wendy Gore and the defendants. They said if Martin Butler entered that agreement in regards to whether or not they exchanged their one-seventh interest in the rents for the farm in exchange for the occupancy of Martin Butler for the West House. And so the first issue that we argued is that the fact that if there's an agreement between an agent for their one-seventh share in exchange for their agent residing in the West House, that agreement trumps any calculation of rents between the partners. The court found the fact that there was an agreement that Mr. Gore and Wendy Gore, the six-seventh interest owners, could rely upon that agreement, but they couldn't rely upon that agreement after the filing of the lawsuit by the plaintiffs. And that's an issue that we disagree with. We believe that in fact if there was an agreement, that that agreement would survive the lawsuit that was filed because it would still be bound by that agreement. It turns out that that agreement would be pretty good. It would be a better deal for the one-seventh owners. Because if you look at the stipulations of the parties and you look at the fair market value of the property that the Gordes in fact used, which was the Tillable Acres, and you count that against the West House and the bathroom that was taken by their agent, the Gordes did not take more than their proportional share of the co-tenancy, of the rents. And so they had no duty under Conserve v. Novak to account, or they were not required to account to any co-tenants because they didn't take more than six-sevenths of the share of the undivided property. Conversely, in applying the actual amount of rents that were actually collected, the fair market value of everything that was occupied, the defendants are liable to the six-seventh interest owners because they took more than their proportional share. If you count the West House and the bathroom against the plaintiffs. I have this in that. So the bathroom was taken, there was a bathroom in one of the buildings, and it was taken, everything, there was a heater, there was a vent, there was a vanity, it was taken down to the studs. Everything was removed. Not just the fixture. Everything that would be associated with that bathroom inside that building. So it was taken down to the studs. Everything was removed. Plumbing and everything was removed. The other issue that's before the court is the issue of sanctions. We had filed in 2012 a rule of petition for sanctions under Rule 137 and also under 219. We believe that in regards to the pleadings that were complained of in that pleading that they were not well-grounded, not supported by existing law, and imposed for improper purpose. In fact, the court made a finding of fact that Martin was running the show. He was running the litigation in this matter, and his relationship with the plaintiffs should have been disclosed. However, the court determined that because there was a consent order entered in 2007, that that consent order barred the 6th, 7th interest owners from collecting for the violations of Rule 137 and 219. And it's our contention that that's not correct. That was not a correct ruling. The consent order identified that there were four that resolved all issues, except four issues remaining between the parties. It indicated that Butler's rents for the land and building would be determined, Butler's claims for attorney's fees, and interest on those rents for both the buildings and land would be determined. In the same paragraph, however, in the consent order, if you read it, it's conflicting because it says, except for the issue of interest and attorney's fees, all other issues have been resolved. So it's not exactly clear as to... There is conflicting language in the 2007 order. However, what is clear from that order is that nowhere in the consent order from 2007 did ever the Jim and Winnie Gords ever knowingly and voluntarily waive any claim for either statutory claims or Supreme Court rule claims for sanctions under Rule 137 or 219. There's no language that suggests that there's any waiver of any of those claims. Although I wasn't able to find any cases on point as to the issue of Supreme Court rule sanctions, in regards to statutory waivers, the courts have determined the fact that that type of waiver has to be knowingly and voluntarily. I think that would still apply as it relates to... What year were those claims filed? 2012. So in this particular case, there was an oral motion for voluntary dismissal, and then the courts filed a petition for sanctions within 30 days of that motion. And then the case was reinstated subsequent to that. Thank you. The issue of this agency, this undisclosed agency, was relevant to all of the issues that were still remaining before the courts, specifically in regards to the rents from 1989 to 1993. If it had been disclosed, then that would affect whether or not the defendants or the plaintiffs were in fact liable to the appellants for their agent residing in the West House. There was an issue relating to petition fees. The 1-7th order of interest were seeking attorney's fees. And once again, that's relevant because to order to collect attorney's fees, you have to be acting on behalf of all the parties. And if you are not disclosing an agent-principal relationship, then certainly you can't say that you're acting on behalf of all the parties. It also indicates that to order to collect those fees, you have to be acting in good faith. They were also making a claim for prejudgment interest. Once again, the failure to disclose this, 2007 going forward, even if any claims were barred for anything that was waived prior to 2007. All these issues from 2007 to 2016, when the case was resolved at trial, all those issues would still be relevant. The issue of the agency and the undisclosed principal would be relevant. In fact, there is an Illinois rule of professional conduct, Illinois 4.12, which says that a principal shall be disclosed if that nondisclosure would constitute fraud. In this particular case, we believe that the failure to disclose that in particular in regards to a petition suit, where someone has to file a petition claim and they have to list all the orders and all the interest, the failure to disclose an agency relationship such as that would constitute fraud. What's our standard of review on that issue? Refusal to award sanctions. Judge, I believe that it is abuse of discretion. I believe it is abuse of discretion. In looking at, there is a case that does address that issue of abuse of discretion. And that was the Yarvitz v. Allen case. It was an error not to award sanctions where a party had filed a complaint to enforce a contract when there was clearly an arbitration clause in the contract and they needed to go to arbitration first. There's not a case that I'm aware of that deals directly with this particular issue, but the trial judge never got to that issue. He indicated that, well, you waived these claims when the agreed order was entered in 2007. And so we never got to the issue as to whether these sanctions, or these statements in their discovery and sanctions, excuse me, statements in their pleadings, whether those were reasonable, that sort of thing. When did you learn about that? It was never, up until trial, and even up until immediately before trial, defendants were filed a motion to say that these are worthless documents, indicating the fact that these documents were... Let me rephrase my question. When did you receive the documents? So my clients received the documents in bulk sometime after the death of Martin Butler in 2000. My client testified he did not know whether he was aware of the existence of this particular document. He had it in his possession. Whether he was aware of that particular document at the time that the agreed order was entered, he wasn't sure. There was testimony of their prior attorney, and that is also one of our issues. We was called as a witness for the plaintiffs over the objection of James and Wendy Gordon. He testified that in fact he knew of those documents prior to the entry of the 2007 order. Thank you. Robert Eschbach. Good afternoon, Your Honors. May it please the Court, I'm Robert Eschbach. I'm representing the plaintiffs, Edward and Elaine Butler, in this cause. I appear before you today almost 28 years after Butler v. Gord was filed here in LaSalle County. 28 years has elapsed. I've worked with six different defense attorneys. I think I've appeared before six different judges. I've had two clients pass away during this time. So I come before you today with a sense of relief knowing that this case is approaching finality, or I sincerely hope so. Your Honor. Your Honors, the rents and the interest on rents are part of the appeal and the cross appeals. I want to kind of talk about them together because it will help you understand the issues here. Recall that in 1989, a year before this case was filed, James Gord took over operation of what was the Butler family farm originally. Ann Martin was the patriarch, so to speak. Ann Martin was pushy, I'll admit that. And the judge after hearing the evidence said, really, the agency argument is tossed on head. Martin was running the show. It wasn't the kids giving him authority to do something, even though they had legal ownership. Martin was telling them. And in fact, when Wendy signed a deed, Mrs. Gord signed a deed to convey her 121st interest, her third of a seventh, to my clients, she admitted she did it just because Martin told her to. But the court also said, when you file a lawsuit, a lawsuit has consequences. And even though the court found that in 1989 there was no direct evidence submitted that Martin had any agency authority, there was no evidence that Martin said, my sons say that I can do this on their behalf. It was just Martin said, I'm going to stay on the farm and you can keep my kids' share of the rent. Well, the court said, that's fine, we'll call it a parent authority. And they said, you're not going to collect rent for that year. But in 1990, when the lawsuit was filed, my clients made it very clear that they were asserting their authority and asserting their rights. You don't file a lawsuit for a petition and you don't ask for an accounting if you know that you've given your father the right to live there and to make these agreements for you. So what the court found is that when the lawsuit was filed, the plaintiffs were asserting their rights, the court found it was unreasonable for the Gord's to assume that Martin still had authority, that in its essence the lawsuit, if there was a delegation of rights in the agency relationship, that it was revoked by the final of the lawsuit. So what the court did is the court said, alright, we'll honor that agreement under this concept of a parent authority for the first year, but after the lawsuit, no more. They filed, the law says that they own one-seventh of the property and they should get it. In other words, the final of the lawsuit has consequences. Now this document here, there was never any evidence presented remember the question that was asked in the deposition, did you give authority to your father, Martin Butler, did my clients give authority to Martin Butler to deal with James Gord? There was never any evidence that he ever approached James Gord that I'm their agent, I'm acting pursuant to some sort of document. In fact, the only evidence was that that was given to me and nobody else because they filed and I filed, and I didn't draft that by the way, that I needed some authority to talk to Martin Butler. Martin was the one that lived here. My clients lived in San Francisco and Kansas and they said that I could talk through Martin. So I did that, but they had nothing to do with an agency relationship with Mr. Gord. So what the court did then is it ruled against us as far as rents for 89, but it granted rents for 1990, 91, 92, 93 as long as Martin was on the farm there and those rents were about $15,000. Now the court did not give us interest on that money and the reason the court didn't give us interest it said was because even though the court found that there was no agency relationship after 1990 when the lawsuit was filed, that the plaintiffs or the defendants made a good faith argument, so it wasn't going to give interest. And it also said that even though after the court said that it can be argued two ways, and it was argued two ways, whether those documents constitute an agency relationship. We argued they did and it was given authority to me and that's the only time that document was ever used. The court said it should have been disputed, so no interest. So basically the defendants had the benefit of using my client's money, $15,000 for 25 to 28 years over this period of time. Let me ask you, how in the world is a partition suit going? How does the what? How does a partition suit go on for 27 years? I'm getting to that. There was a lot of delay there. So we can live with that. We're not saying the judge abuses discretion. We'd have liked to have the interest, but it's important in understanding the second part of the case and that runs from 1994 after Martin had left. There's no more Martin on the farm until 2007. That's 13 years from 94 to 2007. 13 years my clients did not receive one cent of rent while Mr. Gord was farming the land and they weren't getting their one-seventh share. But in December of 2007, the parties reached an agreement. It's an agreement that Mr. Truenberg referred to. And it was agreed that my clients would accept $60,000 and the defendants would pay $60,000 for the last 13 years of rent. And in January of 2008, they paid it. But the issue of interest on all that money was specifically reserved in that agreement. Now, the court entered judgment not only for the 90 to 93 rents, but it also entered judgment for the 94 to 2007 rents as agreed in the 2007 order. But the court did not award interest, and that's our point of contention. And we believe we should have had interest on the rent. And what did the court say in denying interest? It said, number one, what it said with respect to the earlier rents, that we should have disclosed the authorizations because the agency was such a part of the defendant's argument in this cause. And secondly, there were some other shenanigans that the judge used. And then he made reference to this removal of the bathroom that Mr. Truenberg talked about. Well, we disagree with the court, and we think the decision did constitute an abuse of discretion. And here's why. Number one, Martin left the farm in 1993. There can be no argument regarding agency anymore. He's gone. He's not benefiting from the use of the house or anything else. So that doesn't apply. And in fact, no argument for agency could have been made. Secondly, prejudgment interest may be awarded in equity for the loss of the time value of money. That's basically the Fenley proposition for all of these years. The defendants had the use of that money until 2008, and to their benefit and the detriment of my clients. More importantly, and this addresses, I think, your question, the defendants engaged in a pattern of deliberate delay and refusal to accept and obey court orders, prolonging this litigation all the time and enjoying the use of my clients' money. Beginning in 1993, the defendants filed essentially ten motions, basically the same motions, variations on the same motions. Motion to reconsider the same motion. Ten times. Ten times. Most of the times those motions were briefed or position papers were filed. All of those motions were argued in front of the court, and the court every time denied the motions, basically saying I've already ruled on this. Ten times over a period of more than ten years. That's one of the reasons there was delay. And that's all pointed out on page 18 of my cross appeal. Moreover, on at least four occasions, the court ordered the defendants to submit an accounting. Mr. Baird's phone number, ma'am, my clients are out of state. We want to know what's going on. How much money came in? What are our share of the rents? Four times, at least four times, the court ordered the defendants to provide an accounting. Those orders were never obeyed. There was one partial exception in 2002, and that's when the court, excuse me, that's when the defendants uploaded an accounting for the years 1989 to 1993. Now this is 2002. We're getting a partial account of 89 to 93. What happens in 94 to 2002? There's nothing there. So the judge rejected it, and he gave you two more weeks to come back with an accounting that covered the full period to 2002, the time we're in court. Nothing was ever filed. I think just, you know, just as the defendants don't appear to realize that filing of lawsuits have consequences, court orders have consequences. And in denying the court orders and in repeatedly filing the same thing over and over for a period of more than 10 years, the defendants were involved in a pattern of delay, and I act in bad faith while enjoying the use of my plaintiff's money. Next, equitable considerations compel the award of interest here. Finley set the standard when we talked about that, and for here, for up to 13 years, 94 to 2007, plaintiffs were deprived of the use of their money that was rightfully theirs, and the defendants obviously were benefited from the use of that money. All right. Let me ask, on this issue about the interest, what's our standard of view? Abusive discretion, Your Honor. I believe. So it's not what I'd do if I was a trial judge? Right. So I guess what I'm saying is none of the factors that the judge cited, and he gave the reasons why he denied interest, really apply to the 94 to 2007 interest rents, and that's why we say it was abusive discretion. It was never argued that those rents were owed, and in fact, one of the most telling things in the hearing, the five-day hearing, was when Mr. Gord, who was farming the land, was on the stand, and I asked him, why, over all those years, from 94 to 2007, didn't you pay my clients their share of the rent? And his answer was, I don't remember. Finally, in their briefs, the defendants argue there's no duty to account to a co-tenant for rents, but on page five of their reply brief, they claim there's a duty on the part of my clients to account to his clients for rent, and they say, quote, the duty to account to a co-tenant is imposed by the Joint Tenant Act. So I'll accept that. And finally, the argument there is that the court abuses discretion. Finally, the court pointed out that the plaintiff's expert testimony as to what that amount of interest should be if the court had awarded it was appropriate, and that amount was $29,583 is what you're asking for today. Regarding sanctions, Your Honor, three things. Number one, the plain language of the 2007 agreed order says all other issues were resolved, but even if they weren't, the defendants were precluded from seeking sanctions for not having documents that they had in their possession. They had them from 2000, 2002 on, and their past attorney said, yes, those documents were in existence. He knew of them when the agreed order of 2007 was entered. And when Mr. Gord and Mrs. Gord were on the stand, they both couldn't remember, and the judge specifically said, I find that testimony suspect. He said they basically thought they were telling the truth, but when it came to that, one of the most important things in the case, and they couldn't remember, he found that to be suspect. And finally, they never showed any damages. There was no testimony to show that they were damaged. They already had the documents that they were asking for. And the judge said it was based on two facts, the testimony of William Hotop, their former attorney, and the testimony of the two defendants themselves. Our conclusion, judges, respectfully, you can tell I'm not here very often, was that the court affirmed all of the decisions, all of the rulings of the trial court, except on the issue of interest for those rents from 1994 to 2007, when my clients were deprived of the use of that money in the amount of $29,583. Thank you. Mr. Schulenberg. If you want me to read that, put it closer, I'm seven years old. I can read it now if you'd like. Judge, in regards to the issue of damages, as I briefed and indicated, citing to the record, Judge Kettle indicated that he didn't want to hear any issues as related to Mr. and Mrs. Gore's attorney's fees, because he had not awarded sanctions, and if the case was remanded, he would address that issue then, so I don't believe that's a proper argument. In regards to the issue of accounting, judges, the Butlers, what they wanted was financial records, and that was one of our claims, that there was a Rule 137 violation, because all they were entitled to was fair market value of rents, or actual rents received, depending on whether the property was being occupied or not. So what they were looking for was improper. In regards to dragging out the case, if you look at the court file from 2012 onward, I think you would see, I wasn't a part of the case prior to 2008, but after 2012, when we filed our petition, in fact, what the defendants did was file repeated and duplicitous motions and pleadings as it relates to the filing of this case, which resulted in a four-year delay in the case. Also, in regards to prejudgment interest, and second to the case of Finley v. Finley, that is a prejudgment interest in a child support matter, and the court indicated that in determining prejudgment interest, the question is whether the amount owed is determinable, whether it's not in dispute, and obviously in a child support case, the amount of child support is set. In that case, the father just unilaterally cut child support, and the question was whether or not, this was prior to the amendment of the statute, awarding 9% statutory interest, whether or not she was entitled to interest on the child support that accrued during the time period that the abogee failed to pay child support. Also, in regards to prejudgment interest, the parties must be acting in good faith. I don't believe that the plaintiffs can say that they were acting in good faith. In particular, I'd ask you to look at one of our exhibits that was turned over at trial. It was a November 13, 1993 letter from Mr. Eschbach to both of his clients, which indicates that, pursuant to your original authorizations, I have been consulting with Martin on all issues as they have arisen and will continue to do so. This was right before the depositions. This was right before the interrogatory answers. If you look at the billing statement that was actually sent to Martin Butler, who was paying for his services at the time, it's clear that the authorization wasn't needed for him to hire an attorney because that authorization was reviewed by their attorney after he had been retained. In addition to that, plaintiff's counsel removed all the references to Martin Butler and his communications with him relating to the filing of the petition, relating to his acting on behalf of the plaintiffs from his billing statement when he submitted that to the court, which was inconsistent with the actual billing statement that went out. So it's clear that when they filed a pleading and said that they never had authorized Martin Butler to act on their behalf as it relates to the farm, that that was not true. It is clear when the plaintiffs testified under oath in the deposition and in their interrogatory answers that he was never their agent for any purpose. That was not true. So the other issue in regards to this issue of whether this agency was revoked upon the filing of the lawsuit, how can you revoke an agency if it's never even been disclosed? The filing of the lawsuit doesn't unbind them from the contract that they are bound by from their agent. They can't file a lawsuit to try to get out of that agreement. And the court clearly said that Martin was calling all the shots as it relates to this litigation. Said that this should have been disclosed. The only issue was that the court said that the 2007 order prevents my clients from collecting on these fees or collecting for sanctions. And I believe that that was an incorrect ruling. Once the litigation starts, what's the difference who's calling the shots from a plaintiff's standpoint? So the difference is, Judge, is that they deny that he was their agent. My question is, once the lawsuit is filed, so you've got the plaintiffs over here. How are we going to proceed? What's our strategy? Yadda, yadda, yadda. So when you're over here and you've got the suit, what's the difference who's calling the shot? Whether it's Martin or Siri or some genie in a bottle of the neighbor who says, here, do this, do this, do this, to the named plaintiff. So the reason it's relevant, Judge, is that not so much as to the prosecution of the case, but it's relevant to the issue of that is evidence that the agency in fact existed. And so where it comes into play, just think about 1989 to 1990. Martin Butler is residing in the West House. They file a suit saying, we want you to pay us rent for one-seventh share of the fair market rental value of the West House. So their agent is residing in that. And they don't want to be charged that rent that their agent is living in. So that's why it's relevant. It's not so much that it matters who's calling the shots. It matters as to whether or not that agency existed. And we had to prove that that agency existed. And one of the ways that we proved that agency existed was by the fact that Martin Butler had hired Mr. Ashbach. Martin Butler had reviewed the complaint. Martin Butler had done all these things as it relates to prosecuting the case. He had no authority to do that, but for the fact that he was authorized to act on behalf of the plaintiffs. He sued his daughter and his son-in-law. That is true, Judge, but this shouldn't have taken this long. And the reason it's taken this long was because they purposely didn't disclose this because they basically ran the numbers. They said, what's the chance of this coming up? And it's very unlikely that this would ever come to light. And in fact, because of the nature of the case, because some people died, it ultimately came to light. Well, I get it, but the issue is that they're due cash rents on the property. No accountings. The plaintiffs testified that they never asked their father for rents for the West House. No, I'm talking about the cash rent due from whosoever farmed the property to the plaintiffs. Well, you have to determine, one, what that amount is. And you start that with an accounting of one. You do start that with an accounting, but you don't do that by asking for financial records. You do that by determining what amount of rents were collected or what is the fair market value of the rents on the property. And that was the nature of the litigation. If the parties had agreed upon that, then there wouldn't have been any need for this litigation to go on this long. But they didn't agree to it. They didn't agree to an amount until the consent order was entered in 2007 as to what the fair market value of the rent was. I just have a question. What difference does this agency recognition of the actual agency, the letters, what difference does that make to what the fair market value is in financial statements? Well, it's a separate issue. It doesn't have a direct effect on what the fair market value of the property is. However, it is relevant as to who is going to be responsible to whom for the fair market value of the property. So in relationship to the West House, from 1989 to 1993, if their agent was residing in that house, I think fairly that they should be charged towards the fair market value of the West House. Their argument was, no, we want one-seventh of that rent. Just because he's their agent, maybe they got a different... Let's suppose it's an arm's-length transaction and this is not their file. Just because he's their agent, maybe they've got another way to... Maybe living in the house rent-free is not part of what the remuneration agreement is between them. I'll do this for you, but if you live here, you're not living here rent-free. However I decide to compensate you is going to be some other way. He's our agent, therefore they automatically get taxed with the rental value of that house. You're not. There are circumstances where an agent can bind a principal. One of those is the parent authority. One of those is ratification. All those things exist in this case. They knew that Martin had no interest in this property. They both filed pleadings in regards to... They never objected to anything that Martin did. In relationship to a motion to disqualify Mr. Eschbach as an attorney in this matter, they filed consent documents, I think it was 1994, indicating that they had no problem with everything that Martin did. In addition to that, there's ratification by accepting the benefit of the bathroom for Edward Butler. There's nothing that... Not only that the agency exists, we know the agency exists because the documents exist. He had authority to act on their behalf under the four corners of that document for anything related to the property. If he went out and contracted to sell the property, they would be bound by that contract based on the fact that they had signed those documents in May of 1990. Thank you. Just a couple of points, Your Honors. Mr. Schulenburg seems to say that nobody's entitled to an account until you can prove that somebody's taking more than their fair share. Just for the record, we're here talking. Your time now is for the cross-appeal, the rebuttal on the cross-appeal. It's hard to separate them all. Well, I think everything that was said with respect to the agency, again, doesn't apply to 1994 subsequent. I do take personal affront, and I'm not sure where this fits in, but basically the allegation was made that I somehow scrubbed records. But I testified in front of the court, and I only billed for those things that had to do with this lawsuit. I freely admitted that before the lawsuit was filed, before my client signed on as plaintiff, I was representing Martin. He was the one that came in and decided that one of me ought to sign a deed. He was the one that said, yeah, maybe we should have a partition suit because my kids are out, and I need to get this resolved before they die. I admit that, so I didn't charge for that. There were times I was representing Martin individually and his sister, Julia Baker, and those were on the original bill. I'm not scrubbing records. I wasn't trying to hide anything, and that was all made perfectly clear in my testimony on the stand. Just one more thing. When I said that the plaintiffs delayed this because they kept filing the same thing over and over and that they were acting in bad faith, they didn't follow the orders of the court, Mr. Schulenberger seems to be of the opinion that in that regard, as I started to say, we have to show that before we even entitled accounting that we're not getting our share. How do we know that? They're the ones that are farming. Judge Carter, and this is in the cross appeal on page 19, and one of those times when he said that they had to produce an accounting, he said there is no reason to preclude a hearing and a ruling on accounting, provide the accounting. Provide the accounting first. There may be no objection. Hey, $120 an acre is fine. Give us the money. But they're the ones that are in a position to do it, and they refuse, and they ignore the order four times. That's acting in bad faith. That's prolonging the litigation, and my client should be entitled to interest for that kind of activity. And I think that the court disregarded that and was relying more on the argument in May with respect to the 89 to 93 rents, which we can accept, but we can't accept them with respect to 94 forward. And is that after the auction? The auction was in June or July of 1993, and then Martin shortly thereafter, sometime by the end of 93, is off of the farm. So from 94 forward, there's no allegations of agency or anything like that. Martin's gone.